Citation Nr: 1602924 
Decision Date: 01/29/16 Archive Date: 02/05/16

DOCKET NO. 08-18 391 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to service connection for a right foot disorder, to include calcaneal heel spur.

2. Entitlement to service connection for a left foot disorder, to include calcaneal heel spur.

3. Entitlement to service connection for a right eye disorder.
 
4. Entitlement to service connection for bilateral knee disorders, to include as secondary to a service-connected disability.

5. Entitlement to service connection for bilateral hip disorders, to include as secondary to a service-connected disability.

6. Entitlement to service connection for a lumbar spine disorder, to include as secondary to a service-connected disability.


REPRESENTATION

Appellant represented by: The American Legion


ATTORNEY FOR THE BOARD

C. Boyd, Associate Counsel


INTRODUCTION

The Veteran served on active duty from June 1980 to August 1992.

These matters come before the Board of Veterans' Appeals (Board) from a July 2007 rating decision by the Department of Veterans Affairs (VA) in St. Petersburg, Florida.

The Board remanded the claim in May 2012 and again in March 2014. The Board now finds that further development of the claim for service connection for a right eye disorder is required pursuant to Stegall v. West, 11 Vet. App. 268 (1998). In addition, addendum opinions regarding the Veteran's claims for service connection for, bilateral hip disorders, bilateral knee disorder and a lumbar spine disorder are necessary prior to final adjudication.

The issues of entitlement to service connection for a right eye disorder, entitlement to service connection for bilateral hip disorders, entitlement to service connection for bilateral knee disorders, and entitlement to service connection for a lumbar spine disorder are addressed in the REMAND portion of the decision below and are REMANDED to the AOJ.




FINDINGS OF FACT

1. A right calcaneal spur was identified upon examination in service; the evidence supports the conclusion that the Veteran still has a right calcaneal heel spur.

2. The Veteran did not seek treatment for the left foot in service; the evidence does not suggest that a foot disorder, to include left calcaneal heel spur, was incurred in or caused by military service.


CONCLUSIONS OF LAW

1. The criteria for service connection for a right calcaneal heel spur have been met. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. § 3.102, 3.303 (2015).

2. The criteria for service connection for a left foot disorder, to include a left calcaneal heel spur, have not been met. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. § 3.102, 3.303 (2015).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. VA's Duty to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000) (codified at 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, and 5126) includes enhanced duties to notify and assist claimants for VA benefits. VA regulations implementing the VCAA were codified as amended at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, and 3.326(a).

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his representative of any information, and any medical or lay evidence, that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b); Quartuccio v. Principi, 16 Vet. App. 183 (2002). The VCAA notice must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. VCAA notice should be provided to a claimant before the initial unfavorable agency of original jurisdiction (AOJ) decision on a claim. Pelegrini v. Principi, 18 Vet. App. 112 (2004). 

Here, in a April 2007 pre-adjudication letter, the RO provided notice to the Veteran explaining what information and evidence was needed to substantiate a claim for service connection, including what he needed to provide and what would be obtained by VA. 

VA also has a duty to assist a Veteran in the development of the claim. This duty includes assisting him in the procurement of service treatment records and other pertinent records, and providing an examination when necessary. See 38 U.S.C.A. § 5103A (West 2014); 38 C.F.R. § 3.159 (2015). In this case, the VA obtained relevant records, to include the Veteran's service treatment records, private treatment records and VA treatment records. Neither the Veteran nor his representative has identified, and the record does not otherwise indicate, any additional existing evidence that is necessary for a fair adjudication of the claims that has not been obtained. 

In addition, the Veteran was afforded VA examinations of his feet and ankles in June 2012 and April 2014. Although the June 2012 examination reports and the opinions provided in December 2012 were found to be inadequate by the Board in March 2014, the Board now finds that the April 2014 post-remand examinations were adequate. The examiner had access to and reviewed the evidence in the electronic claims file, recorded the Veteran's subjective complaints, and provided opinions supported by adequate rationale based on the record. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007) (holding that a medical opinion is adequate if it provides sufficient detail so that the Board can perform a fully informed evaluation of the claim).

The Board finds that no additional RO action to further develop the record, prior to appellate consideration, is warranted. The Veteran was provided the opportunity to meaningfully participate in the adjudication of the claims decided herein and did in fact participate. Washington v. Nicholson, 21 Vet. App. 191 (2007). Hence, there is no error or issue that precludes the Board from addressing the merits of this appeal.

II. Entitlement to Service Connection 

Service connection may be granted for disability resulting from disease or injury incurred in or aggravated by active military service. 38 U.S.C.A. §§ 1110, 1131 (West 2002); 38 C.F.R. § 3.303(a) (2013). Service connection may also be granted for any disease initially diagnosed after service, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d) (2013). 

In order to establish direct service connection for a disorder, there must be (1) competent evidence of the current existence of the disability for which service connection is being claimed; (2) competent evidence of a disease contracted, an injury suffered, or an event witnessed or experienced in active service; and (3) competent evidence of a nexus or connection between the disease, injury, or event in service and the current disability. Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. Sept. 14, 2009); Hickson v. West, 12 Vet. App. 247, 253 (1999)). In many cases, medical evidence is required to meet the requirement that the evidence be "competent". However, when a condition may be diagnosed by its unique and readily identifiable features, the presence of the disorder is not a determination "medical in nature" and is capable of lay observation. Barr v. Nicholson, 21 Vet. App. 303, 309 (2007). 

In March 1987, the Veteran sought treatment stating he had experienced pain and tenderness in right heel for two months. X-rays were taken of the right calcaneus and it was noted there was a marked spur off the palmar aspect of the calcaneal tuberosity. Further evaluation indicated mild tenderness at the calcaneal area without ecchymosis. Plantar fasciitis was assessed. In September 1989, the Veteran sought treatment for pain in his right heel. It was noted he had right heel calcaneal spurring.
The Veteran did not seek treatment for symptomatology in his left foot during service. On a July 1992 Report of Medical History, the Veteran denied foot trouble.

A private treatment record dated in January 2007 indicated left plantar fasciitis. It was indicated the Veteran was having heel pain with increase of activities and had x-rays done which showed a left heel spur. Prior to the RO's July 2007 denial, the post-service evidence did not include continuing problems with the right foot.

The RO denied the claim in July 2007 without providing a VA examination. On remand, in May 2012, the Board found the duty to assist had not been satisfied and directed an examiner to identify current disorders of each heel and ankle, inclusive of any heel spurs. For each identified disorder, the Board sought an opinion as to whether it was at least as likely as not that the disorder developed in service or is otherwise causally related to service and whether it was at least as likely as not that the disorder was either caused or aggravated (permanently increased in severity) by a disorder which developed in service. 

In June 2012, the Veteran underwent VA examinations. Bilateral foot/ankle spurs were identified and the Veteran complained of pain over the lateral malleoli bilaterally. The Veteran stated that his right foot/ankle began bothering him in 1982. He indicated the pain "moved into" his left foot/ankle and was eventually told he had a bone spur in his right ankle. He stated that now his feet and ankles bothered him on a daily basis. The examiner provided the opinion that "[a]lthough the patient does have documentation of the above condition, the patient does have a relatively benign objective examination of his [feet/ankles]; he also has normal, age appropriate radiographs of his [feet/ankles]." In March 2014, the Board found this opinion inadequate and unresponsive to the request made in the May 2012 remand. As such, the claim was remanded for another examination.

The Veteran underwent examinations of his feet and his ankles in April 2014. In regard to the feet, the examiner identified bilateral heel spurs and mild left hallux valgus. Imaging studies revealed no acute fracture or dislocation. Mild hallux deformity was seen in the left greater than right, with minimal first MTP degenerative change on the left secondary to the hallux. There was no obvious spurring noted. 

The examiner opined that the condition found on examination was less likely than not incurred in or caused by an in-service injury, event or illness. The examiner opined:

Based on exam today Veteran has evidence of mild asymptomatic left hallux valgus not diagnosed or treated during service. In addition, the presence of bilateral heel spurs is not accompanied with typical plantar fasciitis symptoms. This Veteran does not appear to have any symptoms secondary to calcaneal spurs. Many adults have a history of calcaneal spurs and I find no objective information on exam to suggest this Veteran has any foot condition secondary to service.

In regard to the ankles, it was noted the Veteran had been treated conservatively for ankle sprains during service. Range of motion of the ankle was noted to be normal and imaging studies revealed no radiographically significant findings. No acute fracture or dislocation could be seen. Alignment of the ankle mortise was within normal limits. No focal soft tissue swelling could be seen about the medial or lateral malleolus. Alignment and joint spaces of the midfoot were within normal limits. No ankle effusion was noted. A tiny plantar calcaneal spur was seen, "unlikely of clinical significance." It was noted the Achilles' tendon was grossly unremarkable. Based on history and review of the record, the examiner opined that "[b]ased on exam and radiographs this Veteran has no signs or symptoms consistent with ankle instability or residual symptoms of ankle sprains."

Here, the evidence supports a grant of service connection for a right calcaneal heel spur. Such spur was not noted at the Veteran's April 1980 entrance examination and the first evidence of it appears in the service treatment records. There is evidence that a right calcaneal heel spur was incurred in service and still exists today. 
The evidence does not support a grant of service connection for any other foot/ankle disability on either the right or left. The Veteran did not seek treatment concerning the left foot during service and there is no indication that any diagnosis of a left foot disability had onset in or was caused by any event or injury in service. In addition, the evidence reflects that the Veteran does not have a currently diagnosed disability in his ankles. As the preponderance of the evidence is against the claim for service connection for a left foot/ankle disorder, the benefit of the doubt rule does not apply and the claim must be denied. See 38 C.F.R. § 3.102.


ORDER

Entitlement to service connection for a right calcaneal heel spur is granted.

Entitlement to service connection for a left foot disability, to include a left calcaneal heel spur, is denied.


REMAND

Reasons for Remand: To ensure compliance with prior Remand instructions, to ensure the Veteran is provided with adequate medical opinions regarding the etiology of disabilities in the hips and knees, and to provide an adequate examination of the lumbar spine.

I. Right Eye Disorder

On the Veteran's April 1980 entrance examination, distance vision in his right eye was noted to be 20/100. A measurement for near vision was not reported. Vision in the left eye was normal. The accompanying Report of Medical History showed distance vision in the right eye of 20/70 and near vision of 20/80. In a June 1985 examination, distance vision on the right was noted to be 20/100 and near vision on the right was 20/100. A service treatment record dated in March 1985 indicated that the Veteran was hit in the right eye with a pellet gun in 1977, or approximately three years prior to service, with decreased visual acuity in the eye since that time. A July 1992 Report of Medical History accompanying his separation examination indicated that vision in the right eye was bad due to injury.

In a May 2012 remand, the Board noted that every Veteran shall be taken to have been in sound condition when examined, accepted and enrolled for service, except as to defects noted at the time of the examination, acceptance and enrollment. As such, the Veteran is not considered sound in terms of decreased visual acuity in the right eye which was demonstrated upon entrance into service as having pre-existed service. On remand, the Board sought an examination by a specialist in disorders of the eyes to address the nature of any current disability of the right eye, and whether there was onset or aggravation of that eye disability in service. Specifically, given evidence of injury to the eye occurring prior to service, the Board questioned whether such eye injury or resulting disability became worse during service beyond its natural course. 

In June 2012, the Veteran underwent a VA examination with an optometrist. The Veteran stated he suffered from a BB-gun injury when he was hit in the right eye with a pellet at age 16 and since that time vision had been poor in the right eye. The Veteran stated his vision had "been very stable over the years since the injury occurred." Pigmented scars were noted centrally on the macula. The examiner noted that vision is "about the same as it was" in service, "perhaps slightly worse." It was noted the central retinal tissues were damaged at the time of the injury and that was the reason for the resulting visual impairment. The examiner also noted that over time, mild cataract formation had occurred "which is consistent with and expected in cases of ocular trauma." It was noted that the cataract was only minimally impacting vision because the retinal damage was ultimately the primary reason for poor vision in the right eye.

In March 2014, the Board remanded the claim again finding that the examiner had not provided an adequate opinion regarding aggravation and whether "perhaps slightly worse" visual acuity was due to the normal progression of the Veteran's injury or not. The Board also noted that the Goldman Chart was not completed during the examination and, as such, the Board was unable to determine whether there was any visual field defect associated with the Veteran's right eye disorder that might be demonstrable of an aggravation of the Veteran's pre-existing BB-gun injury to the right eye. In the examination request, it was noted in boldface type that the completed Goldman Chart must be included with the examination report.

In April 2014, the Veteran underwent another VA eye examination. The claims file was not reviewed, although it was noted the examiner did have access to Virtual Benefit Management Systems (VBMS) files. It was noted that the Veteran had a visual field defect, although visual field testing was not performed. In addition, the Veteran was noted to have a centrally located scotoma in the right eye. Preoperative cataracts were noted in both eyes. Retinopathy and maculopathy were noted in the right eye. The examiner specified that the cause of visual impairment in the right eye was macular chorioretinic scars. The examiner noted that without comparison to other visual field studies, it would only be a speculative opinion that could be offered regarding any loss of visual field during service or any aggravation that may have resulted from service.

In December 2014, the RO sought clarification given that the April 2014 examination report failed to provide the Goldman Chart as requested in the Remand. The examiner simply agreed that there were no Goldman Visual Field studies available for review in April 2014 or then in December 2014. The examiner noted that the April 2014 medical opinion addressed the visual field matter stating that without comparison studies any conclusion as to aggravation would be speculative.

In another opinion provided in June 2015, it was noted that the Veteran had not had visual field studies done and none were available for review such that any opinion regarding aggravation of the Veteran's pre-existing BB-gun injury would be speculative.

In November 2015, the Veteran's representative argued that the refractive weakness in the right eye was a separate matter from restricted field of vision or amblyopia or cataracts. He stressed that despite repeated requests a Goldman vision field test had not been performed on the Veteran.
The Board finds that the previous remand directives have still not been satisfied. The Board seeks to know whether the Veteran currently has a visual field defect in his right eye or any other disability of the right eye besides lessened visual acuity. No examiner has performed visual field testing and the results of the Goldman Chart were not provided in the examination report as requested by the Board in the March 2014 remand. In addition, the Board finds that the issue of whether the pre-existing impairment of visual acuity in the right eye has not yet been adequately addressed.

Because RO compliance with remand directives is not optional or discretionary, and the Board errs as a matter of law when it fails to ensure compliance, the Veteran's appeal must again be remanded. See Stegall v. West, 11 Vet. App. 268 (1998).

II. Bilateral Hips

In October 2003, the Veteran sought treatment from a private treatment provider regarding pain in his left hip. He indicated having problems with the left hip for about a year and had been experiencing pain in the groin, thigh and knee. He denied any specific injury or inciting event. In September 2004, x-rays of the bilateral hips were taken by a private treatment provider. Advanced osteoarthritis of the left hip with referred pain into the left knee was found and asymptomatic moderate arthritis was noted in the right hip. In October 2004, the Veteran underwent a left total hip arthroplasty following a preoperative diagnosis of severe arthritis. In March 2007, after the osteoarthritis in the right hip progressed to the point that it affected the Veteran's activities of daily living, he underwent a right total hip arthroplasty.

Because there was no evidence of treatment for the hips in service, the RO denied the claim without scheduling the Veteran for a VA examination. In May 2012, the Board remanded the claim. Related to the hips, the Board requested the Veteran be scheduled for a VA examination and asked an examiner to provide an opinion as to the likelihood that the Veteran's degenerative hip conditions, which resulted in total hip arthroplasties, were the result of or causally associated with a tibial osteochondroma originating in service, in light of the Veteran's relatively young age at onset of the severe degenerative hip conditions.

At a VA examination in June 2012, bilateral hip strains were identified along with degenerative joint disease (DJD) status-post bilateral replacements. The Veteran stated both hips started hurting around the same time in 1984. He had no discreet injury to either hip and the damage was simply caused by "wear and tear" over his 12 years of military service. He never sought treatment for his hips while in the military; however, his hips became so bad that he had to have a replacement of the left hip in 2004 and the right hip in 2007. In December 2012, the examiner provided an etiology opinion after having reviewed the claims file. The examiner provided the opinion that "[a]lthough the patient does have documentation of the above condition, the patient does have a relatively benign objective examination of his hips; he also has normal, age appropriate radiographs of his hips." Notably, no radiographs were performed in 2012. In addition, no comment was made on the questions posed by the Board in the May 2012 remand. In March 2014, the Board found the opinion to be inadequate and remanded the claim for another VA examination.

In April 2014, imagining studies of the hips were performed. Bilateral hip replacements were recognized with no evidence of complication. The examiner considered the Board's request to provide an etiology opinion in light of Veteran's age and a trip-and-fall accident in June 1989 which appeared to result in a diagnosis of tibial osteochondroma. The examiner provided the following rationale for the determination that the necessity for hip replacements was not at least as likely caused by an in-service injury, event or illness:

First off, it should be noted a trip-and-fall does not cause an osteochondroma. An osteochondroma is a benign cartilage-capped osseous lesion that often first presents during adolescence. It is not known to occur secondary to a trip-and-fall. This Veteran has bilateral DJD that is n[ow] status post bilateral total hip arthroplasties. I find no objective evidence in records to suggest this Veteran has any hip DJD secondary to service or any accident in 1989. Rather, the bilateral nature of his condition indicates his hip DJD is much more likely secondary to genetic predisposition and age-related hip cartilage changes.

In a November 2015 statement, the Veteran's representative argued that the Veteran has "too many arthritic problems in his early fifties to be normal . . ." The representative pointed out that the Veteran's "post-service work and recreation does not appear to have been particularly physical nor does any family predisposition appear of record." The representative stressed that the Veteran spent 12 years in the Army in physically demanding military operational specialties, to include Track Vehicle Repair and as a Calvary Scout. See DD-214. The representative pointed out that the June 2015 examiner stated genetics was the cause of the Veteran's early arthritis without any supporting evidence of family history or DNA analysis. The Board notes that the Veteran was 43 years old when his left hip was replaced and 46 when his right hip was replaced.

The Board finds that an addendum opinion regarding the bilateral hips should be sought that provides a rationale that takes into account the Veteran's years of active duty service and the early onset of a chronic disease, namely DJD.

III. Bilateral Knees

In June 1989, the Veteran sought treatment for left knee pain which was assessed as medial tibial osteochondroma. The Veteran reported that he hit his left knee up against the floor after he tripped over something. In September 1989, the Veteran sought follow-up. The knee was noted to be asymptomatic with complaint of diffuse knee pain occasionally. The knee examination was noted to be normal.

In September 2004, a private treatment provider examined the Veteran's knees when considering whether he should undergo a total left hip replacement. Pain in the left knee was noted and stiffness in the right knee without pain on motion. It was noted his knee examination was benign. X-rays of the knees showed well maintained joint spaces with no bony abnormalities noted.

The RO denied the claim in July 2007 without providing the Veteran a VA examination. In May 2012, the Board remanded the claim the schedule an examination and sought an opinion as to the likelihood that any current knee disorder is causally associated with the tibial osteochrondroma identified in June 1989, based on resulting tibial impairment or deformity.

At a June 2012 VA examination, bilateral knee sprains were assessed. No imaging studies were performed. Range of motion was noted to be normal bilaterally. The Veteran indicated that both his knees started hurting around 1986, left worse than right. The Veteran denied any type of discreet injury and described an "insidious onset of bilateral knee pain." In December 2012, the examiner provided an etiology opinion after having reviewed the claims file. The examiner provided the opinion that "[a]lthough the patient does have documentation of the above condition, the patient does have a relatively benign objective examination of his knees; he also has normal, age appropriate radiographs of his knees." Notably, no radiographs were performed in 2012. In addition, no comment was made on the questions posed by the Board in the May 2012 remand. In March 2014, the Board found the opinion to be inadequate and remanded the claim for another VA examination.

At the April 2014 VA examination, the examiner recognized the diagnosis of left tibial osteochondroma in service. The Veteran described current daily bilateral knee pain aggravated by increased activity. Mild medial predominant degenerative joint disease, roughly symmetric, with mild joint space loss and very early, subtle osteophytosis was noted bilaterally on imaging studies. The examiner considered the Board's request to provide an etiology opinion in light of Veteran's age and a trip-and-fall accident in June 1989 which appeared to result in a diagnosis of tibial osteochondroma. The examiner explained that osteochrondroma was not known to occur secondary to a trip-and-fall. The examiner determined that there was no objective evidence to suggest the Veteran had any knee DJD secondary to service or any accident in 1989. Rather, the examiner opined, "the bilateral nature of his condition indicates his knee DJD is much more likely secondary to genetic predisposition and age-related knee cartilage changes."

In a November 2015 statement, the Veteran's representative argued that the Veteran has "too many arthritic problems in his early fifties to be normal . . . " The representative pointed out that the Veteran's "post-service work and recreation does not appear to have been particularly physical nor does any family predisposition appear of record." The representative stressed that the Veteran spent 12 years in the Army in physically demanding military operational specialties, to include Track Vehicle Repair and as a Calvary Scout. See DD-214. The representative pointed out that the June 2015 examiner stated genetics was the cause of the Veteran's early arthritis without any supporting evidence of family history or DNA analysis.

The Board finds that an addendum opinion regarding the bilateral knees should be sought to provide a rationale that takes into account the Veteran's years of active duty service. In addition, given evidence of knee pain being related to the Veteran's hip problems, if service connection is found to be warranted for the Veteran's hips, it should be considered whether a knee disability is at least as likely as not secondary to that service-connected disability. 

IV. Lumbar Spine Disorder

A STR dated in October 1985 indicates treatment for low back pain.

On a July 1992 Report of Medical History, the Veteran related having a recurrent back pain. It was noted lower back pains "come and go."

In February 2009, the Veteran underwent an MRI of the lumbar spine. The impression was a focal herniated disc that moderately impinged on the thecal sac reducing the AP diameter of the thecal sac about 7 millimeters. It was noted this resulted in crowding of the intrathecal portion of the nerve root from L-4 downward and also touched the right existing L-3 nerve root. A posterior anmular tear with mild disc bulge at L5-6 resulting in mild central canal and mild bilateral recess stenosis was also noted.
The RO denied the claim in July 2007 without providing a VA examination. In May 2012, the Board remanded the claim for an examination which took place in June 2012.

At the June 2012 examination, lumbar strain was assessed and limitation of motion was noted upon examination. X-rays were not performed. The Veteran indicated that his low back started hurting while stationed in Germany in 1984 and worsened after he came to the United States and started Air Assault training. He stated that he never had a discreet injury and attributes the back pain to "wear and tear" on his spine. He reported having multiple epidural injections into his spine over the years. 

In December 2012, the examiner provided an etiology opinion after having reviewed the claims file. The examiner provided the opinion that "[a]lthough the patient does have documentation of the above condition, the patient does have a relatively benign objective examination of his back; he also has normal, age appropriate radiographs of his back." Notably, no radiographs were performed in 2012. The Board found the opinion to be inadequate and remanded the claim for another VA examination.

At the April 2014 VA examination, it was recognized that the Veteran was treated conservatively for low back pain and bruising during service. The Veteran currently described daily low back pain that had persisted "for the last several years." Imaging studies were performed; there was no acute process noted and no significant degenerative change identified. Atherosclerotic calcification was noted. The examiner failed to diagnose a current back disability and stated that it was not at least as likely as not that a current back disability was incurred in service or caused by an in-service event or injury. In support of this conclusion, the examiner stated:

During service the Veteran was treated conservatively for low back pain. Today's exam and previous spine radiographs are consistent with no significant back condition. Based on exam today I find no objective signs of any back condition that has occurred secondary to service.

In light of the February 2009 MRI of the lumbar spine that demonstrated the presence of stenosis and degenerative disc disease with sciatica, the Board questions the adequacy of the April 2014 examination or, at the least, the examiner's review of the record. When VA undertakes to provide an examination, it must ensure that the examination or opinion provided is adequate. Barr v. Nicholson, 21 Vet. App. 303 (2007). On remand, the examiner is asked to address the February 2009 MRI of the lumbar spine that show diagnosis of DDD, stenosis and sciatica in the low back. In addition, if service connection is found to be warranted for the Veteran's hips and/or knees, it should be considered whether a current lumbar spine disorder is at least as likely as not secondary to any service-connected disability or disabilities.

Accordingly, the case is REMANDED for the following action:

1. Associate all outstanding VA treatment records with the electronic claims file.

2. After records have been associated with the electronic claims file, schedule the Veteran for a VA eye examination with an ophthalmologist in order to determine whether the Veteran's right eye visual acuity impairment was aggravated by service or whether he has an eye disorder unrelated to pre-existing impaired visual acuity that is at least as likely as not directly related to service.

The electronic claims file must be made available to the examiner, and the examiner must specify in the examination report that the claims file has been reviewed. All tests deemed necessary should be conducted, to include visual field defect testing.
The examiner should report the Veteran's central visual acuity of the eyes and the visual field of the eyes using Goldman Chart testing with the measurements provided for all relevant quadrants in the eyes, including any notations of diplopia if appropriate. The completed Goldman charts must be included with the examination report. 

The examiner should then opine as to whether the Veteran's right eye disorder, including any decreased visual acuity or visual field defects were more likely, less likely, or at least as likely as not (50 percent or greater probability) aggravated (i.e., permanently worsened beyond the normal progression of that disease) by his military service. 

The examiner should specifically determine first whether (a) there was a permanent increase in symptomatology during military service; and (b) if so, whether or not such increase in symptomatology was due to the normal progression of that disease.

The examiner is reminded that the Board has already found as conclusive fact that the Veteran's right eye visual acuity was noted as being decreased on entrance into military service. Therefore, the Veteran is NOT sound as to any visual acuity defect in his right eye. The Veteran, however, is sound as to any visual field defects of his right eye.

As such, the examiner should also provide an opinion as to whether any visual field defects or other right eye disorder not associated with impaired visual acuity was at least as likely as not incurred during service or resulted from an event, disease or injury therein.

Note: The term "at least as likely as not" does not mean within the realm of medical possibility, but rather that the medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of a certain conclusion as it is to find against it. 

The examiner should specifically discuss any relevant service treatment records in the examination report, as well as any lay statements from the Veteran regarding right eye symptomatology during and after discharge from service.

All opinions must be accompanied by a clear rationale. If the examiner opines that any of the above questions cannot be resolved without resorting to speculation, then a detailed medical explanation as to why this is so must be provided.
 
3. After records have been associated with the electronic claims file, the RO should provide access to the Veteran's electronic claims file to the 2014 VA examiner or, if the 2014 VA examiner is unavailable, to another suitably qualified VA examiner for an addendum opinion to address the etiology of the Veteran's early on-set DJD in the bilateral hips.

The examiner should opine whether it is at least as likely as not that DJD of the hips, a chronic disability that led to bilateral total hip replacements prior to the age of 50, had its onset during 12 years of service in the Army. 
Note: The term "at least as likely as not" does not mean within the realm of medical possibility, but rather that the medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of a certain conclusion as it is to find against it. 

All opinions must be accompanied by a clear rationale. If the examiner opines that any of the above questions cannot be resolved without resorting to speculation, then a detailed medical explanation as to why this is so must be provided.
 
4. After records have been associated with the electronic claims file, the RO should provide access to the Veteran's electronic claims file to the 2014 VA examiner or, if the 2014 VA examiner is unavailable, to another suitably qualified VA examiner for an addendum opinion to address the etiology of the currently diagnosed DJD in the Veteran's knees.

Following review of the claims file, to include the Veteran's service treatment records, VA treatment records, and private treatment records, the examiner is requested to provide an opinion as to whether it is at least as likely as not (50 percent probability or more) that the DJD in the Veteran's knees was incurred in or aggravated by his 12 years of military service, to include as secondary to disability in the bilateral hips that led to total replacements prior to the age of 50. If the examiner determines that any disabilities contributed to or accelerated the Veteran's current knee disability, the examiner must state to what extent the disability did so.

Note: The term "at least as likely as not" does not mean within the realm of medical possibility, but rather that the medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of a certain conclusion as it is to find against it. 

For purposes of this analysis, "aggravation" is defined as a permanent worsening of the nonservice-connected disability beyond that due to the natural disease process.

All opinions must be accompanied by a clear rationale. If the examiner opines that any of the above questions cannot be resolved without resorting to speculation, then a detailed medical explanation as to why this is so must be provided.
 
5. After records have been associated with the electronic claims file, schedule the Veteran for a VA examination with an appropriate specialist to address whether a current disability exists in the Veteran's lumbar spine and to opine as to its likely etiology. 

The electronic claims file must be made available to the examiner for review and it must be clear from the examination report that a review was made. 

Any testing deemed necessary to provide accurate diagnoses of any disability currently present must be administered, to include imaging studies.

Following review of the claims file, to include service treatment records, VA examination reports and the February 2009 MRI report showing degenerative disc disease, sciatica and stenosis in the Veteran's lumbar spine, the examiner is requested to provide an opinion as to whether it is at least as likely as not (50 percent probability or more) that any currently diagnosed disability of the lumbar spine was incurred in or aggravated by the Veteran's 12 years of military service, to include as secondary to disability in the bilateral hips that led to total replacements prior to the age of 50 or disability in the bilateral knees. If the examiner determines that any disabilities contributed to or accelerated a current disability of the lumbar spine, the examiner must state to what extent the disability did so.

Note: The term "at least as likely as not" does not mean within the realm of medical possibility, but rather that the medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of a certain conclusion as it is to find against it. 

For purposes of this analysis, "aggravation" is defined as a permanent worsening of the nonservice-connected disability beyond that due to the natural disease process.

All opinions must be accompanied by a clear rationale. If the examiner opines that any of the above questions cannot be resolved without resorting to speculation, then a detailed medical explanation as to why this is so must be provided.

6. To help avoid future remand, the RO must ensure that all requested action has been completed in compliance with this REMAND. If any action is not undertaken, or is taken in a deficient manner, appropriate corrective action should be undertaken. See Stegall v. West, 11 Vet. App. 268 (1998).
7. Thereafter, re-adjudicate the claims. If the benefits sought are not granted, the Veteran and his representative should be furnished a Supplemental Statement of the Case and be provided an opportunity to respond. The claims should be returned to the Board as warranted.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
KATHLEEN K. GALLAGHER
Veterans Law Judge, Board of Veterans' Appeals




Department of Veterans Affairs